MELINDA HAAG (CABN 132612)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

BENJAMIN TOLKOFF (CABN 288816)
MARC PRICE WOLF (CABN 254495)
BRIGID MARTIN (CABN 231705)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Brigid.Martin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 13-0693 SI |
|     Plaintiff, | UNITED STATES' TRIAL BRIEF |
|   v. | |
| ELIJAH COOPER, | Pretrial:    April 21, 2015<br>Time:      3:00 p.m.<br>Court:    Hon. Susan Illston |
|     Defendant. | |

The United States respectfully files this Trial Memorandum pursuant to the Court's Order for

Pretrial Preparation.

**I. Statement of the Case**

    **A. Charges**

    The Second Superseding Indictment charges the defendant with three counts of violating federal

law.  The first count alleges that the defendant possessed with intent to distribute and distributed 28

grams or more of a substance or mixture containing cocaine base, in violation of 21 U.S.C. § 841(a)(1)

1 and (b)(1)(B)(iii). The second count alleges that the defendant used a communication facility to commit

2 a drug felony, in violation of 21 U.S.C. § 843. And the third count alleges that the defendant conspired

3 to distribute and possess with intent to distribute 28 grams or more of cocaine base, in violation of 21

4 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B)(iii). The Second Superseding Indictment was returned by the

5 grand jury on April 7, 2015; the defendant was arraigned on April 14, 2015.

6 **B. Trial Status**

7 The sole defendant, Elijah Cooper, is currently scheduled for trial on Thursday, May 14, 2015,

8 with jury selection to be completed on Thursday, May 7, 2015, all before the Honorable Susan Illston.

9 The estimated length of trial is approximately four days.

10 **C. Discovery**

11 The United States has complied, and will continue to comply, with its discovery obligations. The

12 defendant has not provided any reciprocal discovery, nor has he noticed any expert testimony. The

13 United States has provided expert notices for and intends to call four expert witnesses: (a) two chemists,

14 who tested the cocaine base at issue in this case and will testify that it is indeed a substance or mixture

15 containing cocaine base, and can testify to the net weight of the cocaine base mixture; (b) a drug

16 trafficking expert from the DEA, Special Agent Dave Mateer, whose expertise will aid the jury in

17 understanding the operation of a conspiracy to distribute cocaine base in the amounts consistent with

18 those seized in this case, as well as behavior of individuals engaged in drug distribution and (c) a cell

19 site expert who will describe the approximate locations of the defendant's and coconspirator's Knight's

20 cell phones at specific dates and times during the charged conspiracy.

21 **II. Statement of Facts**

22 On or about February 4, 2013, and continuing until on or about March 18, 2013, the defendant

23 Elijah Cooper conspired with Anthony Knight, a/k/a "T.K.," Henry Tobias, and others to distribute and

24 possess with the intent to distribute cocaine base (crack).

25 **A. February 5, 2013 Cooper Supplies Knight; Knight Supplies CW**

26 The government, while generally aware of Cooper because of Cooper's prior federal conviction

27 and supervised release status, first became aware that Cooper was engaged in drug dealing on or about

28

U.S. TRIAL BRIEF
CR 13-0693 SI                    3

1   February 5, 2013.  On February 5, 2013, a cooperating witness (CW) made a controlled buy of cocaine

2   base from Knight.  The CW had previously engaged in controlled buys from Knight.  The CW set up the

3   buy the day prior, February 4, 2013, via telephone communication with Knight at 415-374-3867.  On

4   February 4, 2013, the CW contacted Knight via text message at approximately 11:41 a.m., and then

5   called Knight at 11:49 a.m.  Knight returned the CW's call at 12:26 p.m. (call was not recorded) during

6   which Knight agreed to sell the CW an ounce and a half of crack cocaine the following day.  Following

7   Knight's conversation with the CW, at 1:50 p.m., Knight's phone 415-374-3867 called 415-410-9876;

8   the call lasted 28 seconds.  At 2:30 p.m. there was a second outgoing call from 415-374-3867 to 415-

9   410-9786; the call lasted 22 seconds.  At 2:41 p.m. there was a third outgoing call from 415-374-3867 to

10  415-410-9786; the call lasted 25 seconds.

11       Then, at 4:32 p.m., the CW and Knight had a recorded phone conversation during which Knight

12  agreed to sell the CW an ounce and a half of crack the following day.  The next day, February 5, 2013,

13  just before 2:00 p.m., the CW called Knight and told him the CW would be arriving at a post office in

14  San Francisco in fifteen minutes.  Immediately following that call, Knight's phone 415-374-3867 made

15  an outgoing call to 415-410-9867; the called lasted 31 seconds.

16       At 2:14 p.m., the CW called Knight at 415-374-3867 and told Knight that she was pulling into

17  the post office.  Immediately following that call Knight dialed 415-410-9786 twice; the first call lasted 2

18  seconds, the second lasted 40 seconds.  The CW then pulled into the post office parking lot, and Knight

19  walked over and got into the CW's car.  Photographs of the meeting as well as a video and audio

20  recording capture this meeting.  After Knight got in the car, the CW drove to a second location.  At 2:19

21  p.m., the CW and Knight arrived at India Basin Shoreline Park parking lot.  Knight told the CW the

22  drugs would cost $1,350; the CW paid Knight.

23       At 2:23 p.m., a white Mercedes with California plate 6LAR467 pulled onto Bay Trail near where

24  the CW was parked.  Knight then got out of the car for a short period, met with a man later identified as

25  Cooper, and then returned and handed the CW an ounce of cocaine base in four small baggies.  Knight

26  said that someone would bring the rest.  The CW and Knight waited.  The white Mercedes left and

27  returned around 2:30 p.m.  Knight again met with Cooper and returned and delivered to the CW another

28

half ounce in one additional baggie.  The CW then dropped Knight off at the bus stop back near the post office where they had met.  Cell site data for 415-410-9786 is consistent with the location of the controlled buy.

The cocaine base was tested and weighed by the DEA laboratory and determined to be a mixture containing cocaine base with a net weight of 40.5 grams.

<u>Identification of Cooper</u>

Later that day, a few hours after the controlled buy, FBI agents and SFPD officers saw Cooper driving the white Mercedes.  Cooper was wearing a blue hooded sweatshirt.  Initially, the CW identified the driver of the Mercedes as Tony Befford.  However, the next day, agents sent the CW a booking photo of Cooper and the CW identified him as the driver of the white Mercedes who met with Knight during the February 5 controlled buy.  The CW told agents that Cooper was wearing a "royal blue" hooded sweatshirt when she saw him during the controlled buy.

The phone 415-410-9786 was determined to belong to Cooper.  Although the subscriber information was for "Joe Clark," other evidence shows this was Cooper's phone.  During late February, March, and April, calls for 415-347-3867 (Knight's phone) and 415-410-9867 were wiretapped.  Based on agents' voice recognition of Cooper, and context of the calls, they were able to determine that it was Cooper talking during calls made to and from 415-347-3867.  In addition, the cell site data for this number is consistent with Cooper's known location during certain points of surveillance.

During intercepted and recorded phone calls on March 3, April 8, and April 9, 2013, other people speaking to Cooper refer to him with the nickname "Fo."  When Henry Tobias's phone was seized after he was arrested for dealing cocaine base on March 4, 2013, his contacts list included "Fo" at 415-410-9786.  Tobias's call log show twelve calls to or from "Fo" between December 21, 2012, and March 3, 2013, despite a gap in any phone activity by Tobias between the December 27, 2012, and January 6, 2013.

On a number of occasions between February 5, 2013, and March 18, 2013, Cooper was captured by pole cameras located at Middle Point Road and West Point Road[1] – in a blue hooded sweatshirt,

---

[1] There were three pole cameras collecting video data from the immediate location:  two were on a single pole location at the intersections of Middle Point and West Point Roads, one pointing

U.S. TRIAL BRIEF
CR 13-0693 SI                                          5

driving the white Mercedes, and meeting with Knight, Tobias, and others.  Cooper would meet others near the park or basketball courts, or on the street in cars, in the vicinity of 73 Middle Point Road. Surveillance and pole camera footage captures heavy foot traffic consisting of many different people, including Cooper, going in and out of the apartment located at 73 Middle Point Road.

### B.  Additional Acts in Furtherance of the Conspiracy

The government will also present evidence showing that Cooper was involved in two additional drugs transactions, in which he sold mid-level dealer amounts of crack to Tobias and Knight, who in turn either planned to sell, or did sell, smaller "rock" quantities as street-level dealers.

On March 2, 2013, there begins a flurry of text and call activity between Knight and Cooper. Four times in the evening on March 2, Knight's phone dialed 415-410-9786 with no answer or no connection.  At approximately 8:00 p.m., Knight receives incoming text messages from the same origin, a suspected customer, based on the number, rapid succession, and content of the texts:  "U got a car cuz i'm at home" and then "Vanessa wil come if yur in westpoint."  About ten minutes after these texts, Knight then calls a number not associated with Cooper and speaks to Ray Bessard, who he refers to as "Ray."  Knight tells Bessard that if "dude comes by" he will come over.  The suspected customer texts again about five minutes later, "Wasup."  Twenty minutes after that, Knight calls Cooper at 415-410-9786.  The call is recorded.  Cooper tells Knight that he is "out the way" and will be back later.  The cell site data shows Cooper's phone in Antioch.  Twenty minutes after that, the suspected customer calls Knight; Knight does not answer.  Knight then texts the suspected customer, "Later."  The customer responds, "How long???"  Knight replies, "Wait n."  There are a few additional texts of that ilk exchanged,  Knight then calls back Bessard and says that he (Knight) will come through when "he" calls, indicating that Knight will come to Bessard's place if Cooper calls either Knight or Bessard. Knight then calls Cooper's phone five times between midnight and 10 a.m. the next morning, March 3, 2013; the calls went unanswered.

On March 3, 2013, Cooper shows up at 73 Middle Point Road and circumstantial evidence

---

Southbound down Middle Point, and one Eastbound down West Point that could swing Northbound down Middle Point; and one was on a utility wire that looked behind a building at the intersection to tables near the basketball courts where individuals would frequently congregate.

1   including the pole camera video, cell site data, phone logs, and intercepted texts and calls shows that

2   Cooper is now back in San Francisco and he distributes cocaine base to Bessard, Knight, and Tobias.

### C.  March 3, 2013:  Cooper Resupplies Knight

4          At 11:47 a.m., Cooper answers a call from Knight.  On the recorded call, Cooper tells Knight

5   that he is just getting back to the city.  At 12:45 p.m., Cooper calls Bessard.  At 12:50 p.m., the pole

6   camera captures a silver PT Cruiser drive south and park on Middle Point Road.  The PT Cruiser is

7   registered to Cooper's mother at 69 Kiska Road, which is also Cooper's address as confirmed through

8   surveillance and reported by Cooper to U.S. Probation as his address.  The cell site data for Cooper's

9   phone is consistent with Cooper being at that location on Middle Point Road.  Just after 1:00 p.m.,

10  Cooper texts Knight that he is "at the spot."  The pole camera surveillance shows Knight walk through

11  the basketball court toward 73 Middle Point Road.  Knight then texts Cooper that he is "at the door."  At

12  1:37 p.m., we know that Knight and Cooper are together because Knight's call with an unidentified

13  female is recorded during which Knight tells the woman, "Fo wants to talk to you," and Cooper then

14  gets on the line and tells her to "come here."  Five minutes later, the pole cam video shows Knight

15  walking from the rear of 73 Middle Point Road back to the basketball courts.  At 1:58 p.m., Knight gets

16  a text asking for a "dime;" Knight responds that he will come by.  A couple minutes later another text

17  comes to Knight asking why he didn't call back.  Knight responds that he will be by the basketball

18  courts.

19         Pole camera video shows Bessard getting into a red Mazda parked on Middle Point Road at 1:15

20  p.m. Bessard and the car leave the area captured on camera.  At 1:46 p.m., the camera shows Bessard

21  coming back by foot and walking toward 73 Middle Point Road.  Given the context of calls and texts

22  involving Cooper and Knight saying they will or are coming to Bessard's place, and Bessard's departure

23  from the location this day without seeing him arrive, the surveillance and communications evidence

24  show that Apartment 73 is associated with Bessard and is "Ray's place."

### D. March 2-4, 2013:  Cooper Resupplies Tobias

26         Cooper had called Tobias the morning prior, at 10:17 a.m. on March 2, 2013; the call lasted 39

27  seconds.  Meanwhile, on the morning of March 3, 2013, Tobias is seen on the pole camera video at

28

11:06 a.m. near the basketball courts, and then at 12:12 p.m., getting into a Dodge Journey.  At 1:58 p.m., call toll data shows a call from Cooper's phone at 415-410-9786 to Tobias's phone at 415-876-9914; the call lasted 53 seconds.  At 2:07 p.m., Tobias calls Cooper; the call lasted 35 seconds.  At approximately 2:09 p.m., Cooper walks from the area of 73 Middle Point Road.  At 2:11 p.m., Cooper calls Tobias from the PT Cruiser; the call lasted 15 seconds.  Less than a minute after that phone call, the pole camera captured Cooper passing an item to someone in a Dodge Journey.

The following day, March 4, 2013, Tobias is captured on the pole camera video at 11:48 a.m. doing a hand to hand drug transaction, exchanging cash for a small item he pulls from the back of his pants.  Cooper was sitting next to Tobias during the drug transaction.  Incidentally, Cooper was also wearing the royal blue hooded sweatshirt.  Tobias was arrested shortly thereafter and several individually wrapped rocks of crack cocaine were found secreted from between his buttocks.  Tobias's cell phone was seized and downloaded at this time as well.

The communication between Tobias and Cooper, the surveillance of Tobias in the Dodge Journey and Cooper, the flurry of activity meeting other mid-level dealers, and the fact that Tobias and Knight are mid-level dealers, is further evidence that Cooper supplied cocaine base to Tobias when he handed an item to the occupant of the Dodge Journey on March 3, 2013.

### E.  March 9, 2013:  Coconspirators Meet Up at Ray Bessard's Place

On March 9, 2013, Cooper arrives in the white Mercedes at 8:47 p.m. at the cul-de-sac next to the basketball courts on Middle Point Road.  Upon his arrival, he calls Bessard at 415-756-9353; the call lasted 33 seconds.  Approximately five minutes later, Cooper enters 73 Middle Point Road.  Just four minutes later, Knight calls Bessard and is recorded telling Bessard that he is coming to Bessard's "place."  During the next three minutes, pole camera video and surveillance capture Knight walking down the stairs and into 73 Middle Point Road.  Knight is only in the apartment for three minutes and then comes out and goes back to the basketball courts.  At 9:30 p.m., surveillance spots Cooper leave 73 Middle Point Road, and the pole camera video shows him in the cul-de-sac getting in the Mercedes and driving away.  Cell site data for Cooper's phone 415-410-9786 is consistent with Cooper's movements on this date.  This evidence give further context to the communications and pattern of activity between

1   Cooper, Knight, and Bessard, where Cooper resupplies Knight and possibly Bessard, or stores his stash

2   there, and the transaction occurs at Bessard's place.

3   **F.  March 17-18, 2013:  Cooper Resupplies Knight at Ray's Place**

4   On March 17, 2013, Cooper offered to resupply Knight, and did resupply Knight the following

5   day.  On March 17, at 3:54 p.m., the pole camera video shows Cooper and Knight sitting at a table near

6   the basketball courts together.  Cooper shows Knight a baggie containing a white substance that appears

7   to be crack cocaine.  Cooper hands the bag to Knight, Knight inspect it and hands it back to Cooper.  At

8   8:54 p.m., Knight calls Cooper and tells him in a recorded call that he will call him in the morning.

9   About a half hour later, Knight receives a call from Alissa Thomas, a girlfriend.  Knight asks her for

10  $100 that she owes him.  On March 18, 2013, Knight called Cooper several times before Cooper finally

11  answers at 12:22 p.m.  During the intercepted recorded call, Knight tells Cooper, "I'm on top."  Cooper

12  replies, "I'll be up there."  A few minutes later Thomas calls Knight.  He tells Thomas that he cannot go

13  get food for the two of them because he is about to "go to work."  Immediately following, surveillance

14  views Cooper at his residence at 69 Kiska in the Mercedes.  A call from Cooper to Knight is intercepted

15  at 12:42 p.m., and the two agree to meet at "the spot."  Knight immediately walks to 73 Middle Point

16  Road, and texts Bessard that he is coming to Bessard's place.  Knight is seen by surveillance entering 73

17  Middle Point.  Cooper is then seen a few minutes later entering 73 Middle Point. Cooper has his phone

18  to his ear and a call is intercepted of Cooper asking Knight to open the door.  Four minutes later Knight

19  and Cooper leave the apartment.  Bessard is standing at the door.  Cooper then leaves in the Mercedes

20  and surveillance sees him arrive back at his residence at 69 Kiska. Knight walks to the basketball courts.

21  There are photographs of the surveillance of Cooper and Knight entering and leaving the apartment.  At

22  1:38 p.m., the pole camera video captures Knight conducting three hand-to-hand transactions.  At 4:15

23  p.m., the pole camera video captures Knight conducting two hand-to-hand transactions.  Knight can

24  conduct the hand-to-hands because he has been resupplied by Cooper.

25  **G. Jail Calls**

26  Following Cooper's arrest on drug charges, he was recorded making inculpatory statements

27  during phone calls with his mother.  On October 7, 2013, at 3:02 p.m., Cooper is discussing the case

28

U.S. TRIAL BRIEF
CR 13-0693 SI                              9

against him and the reason he was arrested.  He says to his mother something like, "Knight was serving some broad hella work."  This shows that Cooper knew in advance of any discovery in this case that Knight was supplying a female; the only woman Knight was observed selling any substantial quantity of cocaine base to was the CW.   Cooper further states in a call to his mother on October 7, 2013, at 3:45 p.m., "I'm not worried about it because I didn't interact with her, I didn't sell to her."  These statements prove the defendant's knowledge and participation in the drug dealing scheme with Knight.  Only a conspirator would have this type of knowledge of the somewhat unique details of Knight's customer.

**III. Pertinent Law**

The government must prove beyond a reasonable doubt that:

Count One:  Possession with Intent to Distribute or Distribution of Cocaine Base

    (1)  The defendant knowingly possessed a substance or mixture containing cocaine base; and

    (2) The defendant possessed it with the intent to distribute it to another person, or did distribute it to another person.

Count Two:  Illegal Use of a Communication Facility

    The defendant knowingly or intentionally used a telephone to help in the possession or distribution of cocaine base charged in Count One, or the conspiracy charged in Count Three.

Count Three:  Conspiracy to Distribute or Possess with the Intent to Distribute Cocaine Base

    (1) Between on or about February 4, 2013, and March 18, 2013, two or more persons agreed to distribute or possess with the intent to distribute cocaine base;

    (2) The defendant knew the agreement had an unlawful object or purpose; and

    (3) The defendant joined in the agreement with the intent to further its unlawful object or purpose.

U.S. TRIAL BRIEF
CR 13-0693 SI          10

The government recognizes that, for Counts One and Three, it must also prove the amount of cocaine base in order to prove the charged weight of the drug.  If it does not, then the mandatory minimum sentence called for by the statute will not apply.  The government further recognizes and notes that it must only prove that the defendant possessed, distributed, or conspired to distribute 28 grams or more of a *substance or mixture containing cocaine base*, as set forth in the statute and charged in the Second Superseding Indictment.  The government is not required to prove 28 grams or more of actual or pure cocaine base.

## IV.  Identified Remaining Issues

### A.  Coconspirator Statements Under Fed. R. Evid. 802(d)(2)(E)

The government understands from the defendant's motions in limine that the defendant requested additional narrowing from the government regarding coconspirator statements.  The government provided all such statements in recorded calls and texts (wiretap evidence), and statements made by Knight during the February 5, 2013 sale to CW, and believes that categorically these are all admissible coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).  Nevertheless, in this trial brief, the government has now specifically identified co-conspirator statements by date, time, person making the statement (where known), context, and in some cases the specific statement, in order to streamline the process and make certain that there is no question regarding the admissibility of these statements as during and in furtherance of the conspiracy.

### B.  Other Non-hearsay Statements

In addition to coconspirator statements, the government seeks to admit party admissions (statements by the defendant), whether or not such statements are part of the conspiracy.  Finally, the government seeks to admit non-hearsay statements including the recorded calls above where the defendant is referred to as "Fo."  Identification of the defendant as "Fo" is not offered as a coconspirator statement, and is not hearsay because it is not offered for the truth of the matter asserted.  The mere utterance of the word "Fo" to identify the defendant is relevant to prove association of 415-410-9786 with the defendant via his voice, his nickname "Fo," cell site data, and Tobias's contacts list.

**C.  Poll Cam and Cell Phone Evidence**

The government also plans to admit evidence of the entire pole camera data set for the dates during the conspiracy alleged in Count Three.  However, the government will only present selections from the pole camera video evidence, which will focus around the dates, times, and events set forth above, with a small amount of potential additional footage to identify individuals, vehicles, show the defendant driving the white Mercedes, and show movement and operation of the conspirators.   We will present the evidence through a case agent with an overall description of the pole camera evidence, and then have the agent walk through the specific instances and dates and times set forth above.  We plan to employ a similar methodology for the cell site data and the phone call logs, entering the actual evidence but presenting to a jury a more streamlined summary format, or focusing in on key pieces of data, specifically, those set forth above.

**D.  Stipulations**

Finally, the government will address with the defense and propose stipulations to reduce the length of the trial on non-material issues, particularly with regard to chain of custody and authentication of items like jail calls, which will streamline evidence presentation and may significantly reduce the duration of the trial.

DATED: April 17, 2015                              Respectfully submitted,

                                                   MELINDA HAAG
                                                   United States Attorney

                                                   _____/s/_____
                                                   Brigid Martin
                                                   Marc Price Wolf
                                                   Assistant United States Attorneys